UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHENEE L., | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | No. 3:24-cv-111 (SDV) |
| | : | |
| MARTIN O'MALLEY, | : | |
| | : | |
| *Defendant*. | : | |

## RULING ON PLAINTIFF'S MOTION TO REVERSE DECISION OF COMMISSIONER AND DEFENDANT'S MOTION TO AFFIRM

Plaintiff appeals from the administrative decision of the Commissioner of the Social Security Administration denying her application for supplemental security income. [1]  For the reasons below, plaintiff's Motion to Reverse, ECF 18, is DENIED and the Commissioner's Motion to Affirm, ECF 19, is GRANTED.

### A.  LEGAL STANDARDS

#### 1.  Disability and eligibility

A claimant is disabled under the Social Security Act if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Title XVI of the Act provides for supplemental security income benefits to claimants who are indigent and disabled, without reference to prior work.  *See* 42 U.S.C. § 1381 *et seq.*

---

[1] Plaintiff also applied for disability insurance benefits, R. 359, but conceded in her prehearing brief that the application was effectively for SSI only because her date last insured was in December 2006.  R. 454.

### 2. Commissioner's five-step review

The Commissioner of Social Security is authorized to make findings of fact and decide disability applications, *see* 42 U.S.C. § 1383(c)(1)(A), in accordance with the five-step sequential evaluation process provided in 20 C.F.R. § 416.920.  (1) First, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity.  (2) If not, the Commissioner determines whether the claimant has a medically determinable impairment or combination of impairments that are "severe," meaning that it "significantly limits" the claimant's physical or mental ability to do basic work activities.  (3) If the claimant has a severe impairment or combination of impairments, the Commissioner evaluates whether, based solely on the medical evidence, the claimant has an impairment that "meets or equals" an impairment listed in Appendix 1, Subpart P, No. 4 of the regulations (the "Listings") and that either is expected to result in death or has lasted or will last for at least 12 months. [2]  If so, the claimant is disabled.  (4) If not, the Commissioner determines whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his or her past work. [3]  (5) If not, the Commissioner determines whether there is other work in the national economy which the claimant can perform considering his or her RFC, age, education, and work experience.  *See* 20 C.F.R. § 416.920.  The claimant bears the burden of proof on the first four steps, and the Commissioner bears the burden of proof on the final step.  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

---

[2] *See* 20 C.F.R. § 416.909 (durational requirement).

[3] Residual functional capacity is the most a claimant can do in a work setting despite his or her limitations.  20 C.F.R. § 416.945.

The Commissioner's authority to make these findings and decisions is delegated to an administrative law judge ("ALJ").  *See* 20 C.F.R. § 416.1429.  A claimant may request review of an ALJ's decision by the Appeals Council.  *See* 20 C.F.R. § 416.1467.  If the Appeals Council declines review or affirms the ALJ's decision, the claimant may appeal to the United States District Court.  42 U.S.C. §§ 405(g), 1383(c)(3).

### 3.  Court's review on appeal

A district court reviewing the Commissioner's final decision is performing an appellate function, *see Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981), and has the power to affirm, modify, or reverse the Commissioner's decision based on its review of the briefs and the administrative record.  *See* 42 U.S.C. § 405(g).  "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

## B.  BACKGROUND

The Court assumes familiarity with the medical record and hearing testimony but provides the following summary to contextualize its decision.

### 1.  Procedural History

In September 2020, plaintiff filed a Title XVI application for supplemental security income alleging a disability onset date of May 6, 2020.  R. 361.  The claims were denied at the initial review and reconsideration levels, and plaintiff requested a hearing in 2021.  R. 134, 161, 169-70, 223.  On November 2, 2022, ALJ Eskunder Boyd conducted a telephonic hearing at which plaintiff, her adult daughter, and a vocational expert testified.  R. 38-82.  On December 16, 2022, the ALJ issued a written decision denying plaintiff's claim. R. 11-24.  Plaintiff's

request for review was denied by the Appeals Council, R. 1-6, and plaintiff filed this action on June 25, 2024.

### 2. Personal history

Plaintiff was 46 years old on the date of her September 2020 application. Her earnings record is remarkable for relatively high earnings through 2001, followed by zero earnings between 2002 and 2007, limited earnings between 2008 and 2012, and no earnings thereafter. R. 385. Plaintiff testified that her health deteriorated after her divorce in 2006, when she was diagnosed with lupus. R. 50. She relies heavily on her adult daughters for support with financial and domestic tasks. R. 45, 67. Plaintiff's daughter also testified at the hearing that plaintiff cycles from stable mental health to unstable every two to three weeks, and these episodes start with pain and swelling that leads to depression, sadness and frustration, ultimately requiring hospital treatment. R. 72.

### 3. Overview of physical conditions

Regarding physical impairments, plaintiff's brief focuses on Systemic Lupus Erythematosus ("SLE" or "lupus")[4] and Sjögren's disease. [5] The record includes notes of eight

---

[4] "Systemic lupus erythematosus (lupus) is a chronic (long-lasting) autoimmune disease[.] Lupus occurs when the immune system, which normally helps protect the body from infection and disease, attacks its own tissues. This attack causes inflammation, and in some cases permanent tissue damage, which can be widespread – affecting the skin, joints, heart, lung, kidneys, circulating blood cells, and brain." *See Systemic Lupus Erythematosus (Lupus)*, National Institute of Arthritis and Musculoskeletal and Skin Diseases, https://www.niams.nih.gov/health-topics/lupus (last visited Feb. 21, 2025).

[5] "Sjögren's disease, also known as Sjögren's and Sjögren's syndrome, is a chronic (long-lasting) autoimmune disorder that happens when the immune system attacks the glands that make moisture in the eyes, mouth, and other parts of the body. The main symptoms are dry eyes and mouth, but other parts of the body may be affected as well, with many people reporting fatigue and joint and muscle pain." *See Sjögren's Disease*, National Institute of Arthritis and Musculoskeletal and Skin Diseases, https://www.niams.nih.gov/health-topics/sjogrens-disease (last visited Feb. 21, 2025).

visits with rheumatologist Jessica Stein, MD, between March 2019 and February 2021. The lupus treatment is addressed in more detail in the Discussion section below.

### 4. Overview of mental conditions

In addition to her physical conditions, plaintiff has been treated for mental and behavioral health issues that have variously been described as depression, bipolar disorder and borderline personality disorder. Overlaying these issues is an alcohol use disorder. The medical history included in the administrative record spans from May 2020 to January 2023 and shows a pattern of ongoing mental health counseling and medication treatment, with interspersed emergency room and inpatient treatment for mental health issues, often in the presence of heavy alcohol use. The following is a thumbnail sketch of that treatment.

Plaintiff sporadically attended counseling therapy with Meg Weissman, LCSW. She attended fairly regularly (seven times) between May 2020 and early July 2020, then only once in September 2020, November 2020, and February 2021. She missed six appointments in March and April 2021. She attended four sessions between April and June 2021, then missed three appointments in June and July 2021, after which there are no notes of further counseling treatment. Weissman described plaintiff's complaints as depression and bipolar/alcohol abuse, with issues with relationships and with work and daily regime exacerbated by lupus, Sjogren's disease, anemia and related pain. R. 515, 851, 1053. Weissman encouraged plaintiff to be compliant with medication, to seek structured support for maintaining sobriety, and to work on self-care. R. 537, 1182, 1292, 1433, 1650. When plaintiff moved to a new apartment in April 2021, and Weissman encouraged her to pace herself in organizing and adjusting to the new environment. R. 1292, 1433, 1650.

Plaintiff's attendance at medication management with psychiatrist Adam Fogel, MD, was similarly sporadic.  She had visits in February, April, July, and November of 2021.  R. 1434, 1437, 1440, and 1990.  In December 2021, Dr. Fogel examined plaintiff during a hospital stay. R. 2003.  She visited him again in January 2022, and twice in May 2022, which are the last visits with Dr. Fogel in the administrative record.  R. 1926, 1930-33.  On examination, plaintiff was consistently in a good mood, with no depressed mood, no anhedonia, no hopelessness; no evidence of elated mood, racing thoughts or grandiosity; and no paranoia or delusions.  She also demonstrated a coherent thought process.  R. 1436, 1439, 1442, 1929 and 1935.  The lone exceptions were during her hospital visit in December 2021, when she described feeling frustrated although not suicidal, and in May 2022, when she had a mildly depressed mood.  R. 2003, 1932-33.  The notes at the beginning and end of this treatment window are enlightening. In the first record visit in February 2021, Dr. Fogel noted that plaintiff had been in the hospital earlier that month, which she attributed to bipolar disorder.  R. 1434.  But he appeared to disagree as to the cause, observing that plaintiff "had high [blood alcohol] level as well as [testing positive for] cannabis, this combination leads to paranoia and mood instability which generally leads to ED visits."  *Id.*  In the last record visit in May 2022, Dr. Fogel wrote that plaintiff was

> pre-occupied with being admitted to a hospital but discussed that her ongoing mental health t[reatment] can be continued on an outpt basis, pt does not benefit from psychiatric admissions as evidenced by her numerous admissions and lack of improvement, continues to have very poor coping skills, encouraged ongoing therapy, offered med change but pt declined, recommended AA for [alcohol] use, passive SI does remain but this is chronic for the pt, patients with BPD tend to have chronic SI, this is baseline for Shenee, she does not have access to firearms, she does not have plan or intent to harm self at this time, told if these sx arise to come to the ED.

R. 1935.

Plaintiff's hospital visits were frequent, totaling 13 times between June 2020 and the date of the ALJ's December 16, 2022, decision.  All but one of the visits occurred in the context of alcohol use, often heavy, and emergency department ("ED") visits frequently were followed by inpatient admissions:

**June 6-9, 2020 (Norwalk Hospital)**:  Plaintiff was hospitalized after emergency treatment for clonidine overdose, which she attributed to an increase in depression.  R. 490, 677.  She admitted to daily drinking, R. 489, and tested positive for cannabis, R. 612.  She declined psychiatric hospitalization and was cleared for psychiatric discharge on June 9, 2020.  R. 611-12.

**August 18-24, 2020 (Norwalk Hospital)**:  Plaintiff went to the ED with suicidal ideation after stopping her Wellbutrin and Clonidine medications.  R. 607-09.  Her ethanol level at 9:32 a.m. was 260 mg/dL, which translates to a BAC of 0.26, and she tested positive for cannabis.  R. 686.  She described feeling stress related to isolation during quarantine, a hysterectomy in July, and learning she needs to move by the end of the month from her Section 8 housing.  *Id.*

**October 23, 2020 (Norwalk Hospital)**:  Plaintiff went to the ED feeling depressed.  R. 845, 849.  She had a blood alcohol level of 261 mg/dL (BAC .261) and admitted to drinking a pint of vodka daily.  R. 847-48.  A cannabis screen was positive.  R. 848.  The attending physician concluded that she did "not require inp[atien]t psych admission as no evidence of imminent dangerousness or grave disability, but she could benefit from substance use treatment."  R. 849.

**February 3-8, 2021 (Norwalk Hospital)**: Plaintiff called 911 to seek ED treatment with thoughts of suicidal ideation.  R. 1049.  She reported noncompliance with her Wellbutrin and Clonodine, had a blood alcohol level of 196 mg/dL (BAC .196), and tested positive for cannabis.  R. 1047, 1049.  Nursing notes observed ongoing irritability and demands for medication with

refusal to use coping skills.  R. 1094-99.  At discharge, her nurse noted that "Patient has made some progress thus far" but her "Behavior is provocative, challenging, limit testing, isolative." R. 1101.

**February 17, 2021 (Norwalk Hospital)**:  Plaintiff visited the ED due to falling after several drinks of vodka.  R. 1158.  Acute head injury was ruled out, and she was discharged.  R. 1159.

**November 17-22, 2021 (Norwalk Hospital)**: Plaintiff was treated for a "mental status change" after refusing to pay for her order at a restaurant.  R. 2012.  Her blood alcohol level was 64 mg/dL (BAC .064).  R. 2014.  She was "admitted voluntarily for acute borderline crisis," and the record notes: "Pt has been overall calm with intermittent irritability and making demands and provocative statements in the setting of not getting what she wants.  Pt wavering between demanding immediate discharge and demanding to stay longer."  R. 2012.  The notes also state: "Pt on voluntary status and known to do poorly in the inp[atien]t setting.  Pt does not require an inp[atien]t level of care."  *Id.*

**December 9, 2021 (Norwalk Hospital)**: Plaintiff's daughter called 911 due to suicidal ideation.  R. 1957.  Per EMS, plaintiff exhibited signs of a manic episode with associated symptom of disorganized speech.  *Id.*  She had not been drinking; she was medication compliant; and there was no agitation, mania, or psychosis observed during a consult with her regular psychiatrist Dr. Fogel, so she was discharged.  R. 1824.

**December 12-28, 2021 (Yale-New Haven Hospital)**:  Three days later, plaintiff's daughters brought her to the hospital after a three-day vodka binge.  R. 1798-99.  Plaintiff was crying, screaming, and hitting herself on the stretcher.  *Id.*  She reported medication compliance. R. 1799.  Following is a summary of the report by plaintiff's daughters:

> Unclear what her diagnosis is - have been told it's BPD, bipolar, schizoaffective. Thursday she started a drinking binge.  Spent a night in the hospital, then discharged.  We would love for her to be admitted to inpatient.  She doesn't know how to focus on doing outpatient.  When she gets out in the world and starts talking to people, she can't handle her life.  When she gets out, she's stressed about not being able to keep a job.  Has all these triggers around her, goes through awful ups and downs.  Can't keep her on a stable schedule, can't reason with her.  She'll spiral until she does something that lands her back in the hospital.  Makes frequent statements about wanting to kill herself every time she is upset.

*Id.*  The discharge note assessed a chronic and rapid onset of moderate suicidal ideation and depressive/anxiety symptoms, impacted by medication non-adherence, treatment non-adherence and substance abuse.  R. 1894.  Her condition after a 16-day hospitalization was "fair."  R. 1900.

**May 24-25, 2022 (Norwalk Hospital)**:  Plaintiff called EMS to seek alcohol detoxification.  R. 1936.  She had a blood alcohol level of 178 mg/dL (BAC .178) on arrival at the ED.  *Id.*  She adamantly declined referral to a detox/rehab facility due to her previous experiences and not liking "the demographic there."  *Id.*

**June 16-21, 2022 (Stamford Hospital)**:  Plaintiff attempted suicide via clonidine overdose.  R. 2130.  She reported drinking a liter of vodka daily over the past three weeks and smoking marijuana daily for chronic pain.  *Id.*  She was admitted to the hospital but refused a referral for treatment for alcohol addiction.  *Id.*  On discharge on June 21, 2022, plaintiff was socially appropriate and cognitively intact, with good mood and no suicidal ideation or hallucinations, and she reported fair sleep and appetite.  R. 2131.

**August 4, 2022 (Stamford Hospital)**:  Plaintiff went to the ED for alcohol intoxication and was "actively vomiting in triage."  R. 2793.

**August 15-23, 2022 (White Plains Hospital)**:  Plaintiff went to the ED with suicidal ideation and leg swelling.  R. 2698.  She reported drinking about 2 liters of vodka a day and vaping marijuana, R. 2705, and was admitted for withdrawal treatment, R. 2699.

**September 8-15, 2022 (Norwalk Hospital)**:  This admission is described in notes of plaintiff's encounter with a primary care physician, Nabeela Khan, DO, on September 23, 2022. R. 2928.  The notes state that plaintiff was admitted for a clonidine overdose but, after being stabilized, she refused an inpatient psychiatric admission.  *Id.*

On discharge, plaintiff was prescribed home health care.  There are only two home care visits included in the administrative record.  On September 22, 2022, plaintiff told the visiting nurse that she was feeling depressed, with no hope of obtaining proper treatment.  R. 2888.  On September 28, 2022, plaintiff was unable to buzz the nurse in, and management had to open the door.  The nurse found plaintiff sitting on the sofa slumped over, partially disrobed.  She was depressed and admitted drinking alcohol, but not how much.  When the nurse pressed her to go to the hospital, plaintiff ordered her to get out.  R. 2893. [6]

**5.   The ALJ's decision**

In his December 2022 decision, the ALJ found that plaintiff had the following severe impairments: systemic lupus erythematosus, depressive disorder, bipolar disorder, borderline personality disorder, and alcohol use disorder.  R. 14.  The ALJ also considered plaintiff's allegations of vision impairment, cracked spine, and history of hysterectomy but concluded that these were non-severe because they did not cause more than a minimal limitation on plaintiff's ability to perform basic work activities.  R. 14-15.  He also addressed plaintiff's allegation of

---

[6] The record also includes records of a stay at Norwalk Hospital that began on December 24, 2022, and lasted until January 3, 2023.  On that occasion, plaintiff called 911 due to increasing nausea with diffused general body myalgias while drinking.  R. 3538.  EMS "found several empty bottles of vodka in her home."  *Id.*  She was discharged to home on January 3, 2023, and stated that her neighbor/occasional boyfriend would help her.  R. 3572.  However, because that treatment commenced eight days after the ALJ's December 16, 2022, decision, the Court has not considered it in rendering this ruling.

vestibular disorder and found that it was not established by any medically acceptable clinical or laboratory diagnostic techniques. R. 15.

Moving on to Step 3, the ALJ made two key findings. He first concluded that when including the impacts of her substance use, plaintiff's impairments met the criteria of Listing 12.04 (depressive, bipolar and related disorders). However, he then analyzed the severity of plaintiff's limitations if the substance use were stopped and concluded that, in that scenario, her impairments would not meet or medically equal Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), or 14.02 (lupus). R. 16-18.

The ALJ then determined that, in the absence of substance use, plaintiff had the residual functional capacity to perform light work with the following limitations:

> Never climb ladders/ropes/scaffolds. Occasionally climb stairs/ramps, balance, stoop, and crouch. Never kneel/crawl. Frequently handle/finger. No work in exposure to heat extremes. Can perform simple, routine, repetitive tasks. Can sustain concentration, pace, and persistence for 2-hour segments. Occasional interaction with supervisors. Occasional, noncollaborative interaction with coworkers. Brief and superficial (no more than 10% of the workday) interaction with the public. Requires work with little/no changes in duties/routines. No work requiring independent judgment (no setting duties/schedules for others, no responsibility for the safety of others).

R. 18-23. At Step 4, the ALJ found that the plaintiff could not perform her past relevant work and concluded at Step 5 based on vocational expert testimony that there were jobs that exist in significant numbers in the national economy that plaintiff could perform. R. 23-24. The ALJ therefore concluded that plaintiff was not disabled under the Social Security regulations.

## C. DISCUSSION

Plaintiff raises four claims of error[7] on this appeal: (i) plaintiff would have a listed mental disorder even if she stopped her substance use; (ii) the ALJ misstated evidence concerning lupus, and plaintiff's lupus condition meets the criteria of Listing 14.02; (iii) the RFC determination should have included additional non-exertional limitations relating to her inability to stay on-task, and (iv) the RFC determination should have included additional exertional limitations relating to her right hand.  For the reasons below, the Court finds no legal or factual error.

### 1. ALJ's Step 3 findings on impact of substance use

Plaintiff's first claim of error is that there is not substantial evidence to support the Step 3 finding that, in the absence of substance abuse, she would not have a listed impairment.  By statute, an individual is not considered disabled for purpose of disability insurance benefits "if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C). In other words, where there is a finding of disability but drug addiction or alcoholism ("DAA") is in evidence, the ALJ must examine which limitations would remain if the claimant "stopped using drugs or alcohol" and base the final disability determination solely on those remaining limitations.  20 C.F.R. § 404.1535.  As part of a claimant's general burden of proof at Steps 1 through 4, she bears the bears the burden of proving that substance use is immaterial to the determination that she is disabled.  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 124 (2d Cir. 2012).

---

[7] The summary of the claims on page 2 of plaintiff's brief does not correlate with the actual arguments presented later in the brief.  ECF 18-1.

Plaintiff's central contention is that she would have met the paragraph C criteria of section 12.00 of the Listings even in the absence of substance use. ECF 18-1 at 31. To meet a listing under section 12.00 and qualify as disabled at Step 3, the claimant must have medical documentation of certain hallmarks of the disorder and must also have functional limitations that satisfy either the "paragraph B" criteria or the "paragraph C" criteria. *See* 20 C.F.R. § 404.1520a. In order to meet the paragraph C criteria, the mental disorder must be "serious and persistent," meaning that the claimant has "a medically documented history of the existence of the disorder over a period of at least 2 years," and there also must be evidence of both "Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder" and "Marginal adjustment, [meaning] minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life[.]" *See* Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings") § 12.00.

Here, the ALJ found that, in the context of her substance use, plaintiff's impairments met the criteria of Listing 12.04 (depressive, bipolar and related disorders). However, he then concluded that if plaintiff stopped substance use, her remaining impairments would not meet or medically equal Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), or 12.08 (personality and impulse-control disorders). R. 16-18. Specific to the paragraph C criteria, the ALJ found that the plaintiff's functioning did not occur only within the scope of regimented treatment or assistance nor, when plaintiff was sober, did the record document any decompensation due to minimal ability to adapt to changes. R. 18. The ALJ noted, instead, that plaintiff's repeated episodes of decompensation all occurred in the context of alcohol use. *Id.*

Plaintiff argues that this conclusion is not supported by substantial evidence. She characterizes plaintiff's emotional response to lupus flares as the primary driver of her mental decompensation episodes; she notes that she was observed to be anxious, demanding, odd, and irritable even after detoxification during a February 2021 hospital stay, and once left outpatient therapy after being disruptive; she cites hospital visits in which her blood alcohol level was lower than the legal driving limit; and she describes her alcohol use as a maladaptive coping strategy caused by her other mental health issues. ECF 18-1 at 33-34.

There is no question that plaintiff has physical and mental health challenges; however, even assuming another ALJ reasonably could have decided the issue differently, the favorable evidence cited in her brief does not demonstrate that the ALJ's conclusions were unsupported by substantial evidence. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence.") (citing *Schauer v. Schweiker*, 675 F.2d at 57). The record shows that, in the absence of substance use, plaintiff did not rely on ongoing treatment or a highly structured environment to manage her mental health issues. Her attendance at counseling was sporadic; she rejected referrals to outpatient care; her medication adherence was inconsistent; and although her daughters provided her with financial and emotional support, it was not highly structured such as formal medical treatment would be.

As for plaintiff's contention that her substance use was merely a coping mechanism, or symptom of her other impairments, or a result of decompensation rather than its cause, ECF 18-1 at 32-34, the treatment records uniformly conclude that plaintiff suffers from alcohol addiction. And regardless, the DAA analysis does not ask what caused the substance use but rather "which

of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol." *See* 20 C.F.R. § 404.1535; *see also Smith v. Comm'r of Soc. Sec.*, 572 F. App'x 363, 369 (6th Cir. 2014) (rejecting argument that DAA restriction does not apply where substance use is a symptom of the mental disorder, reasoning that "[t]he statute does not create [an] exception based on the cause of the addiction"). Psychiatrist Dr. Fogel's notes are particularly salient on this issue: he noted in February 2021 that plaintiff's combination of heavy alcohol intake and cannabis use caused her to feel "paranoia and mood instability which generally leads to ED visits." R. 1434. He then noted in May 2022 that plaintiff was using alcohol in lieu of improving other coping skills: he noted that hospital visits did not appear to bring any improvement; he encouraged plaintiff to attend counseling therapy; he offered medication changes that plaintiff declined; and he recommended Alcoholics Anonymous, which she also declined. R. 1935. This history constitutes substantial evidence to support the ALJ's conclusion regarding the severity of plaintiff's mental health limitations in the absence of alcohol use.

The Court has noted plaintiff's citation to questionnaires she obtained from certain treatment providers expressly asserting that she had disabling impairments even in the absence of substance use. R. 3604-05, 3609. However, because those questionnaires were dated January 2023, they were not part of the record underlying the ALJ's December 2022 decision, and the Appeals Council denied review on that basis. R. 2 ("This additional evidence does not relate to the period at issue."). Accordingly, the Court has not considered these questionnaires. However, the Court has considered the "Medical Impairments Independent of Alcoholism and Drug Addiction" form completed by Dr. Fogel in January 2021, in which he assessed her mental abilities and aptitude to do any job to be mostly "poor," meaning that plaintiff had "no useful

ability to function" in those areas.  R. 929-31.  Plaintiff contends that this opinion speaks directly to her limitations even in the absence of alcohol use because it was issued during a "period of sobriety," ECF 18-1 at 37, but it is unclear whether Dr. Fogel actually observed plaintiff's condition while sober given that his first treatment note in the record is from February 2021 (after the January 2021 opinion) and given that plaintiff made three hospital visits for alcohol use relatively close to the date of the opinion, once in October 2020 and twice in February 2021.  R. 845-49, 1047-49, 1158-59.  Moreover, this opinion is more relevant to the paragraph B criteria, rather than the paragraph C criteria on which plaintiff's claim of error is apparently based.

In summary, although the undersigned concludes that reasonable minds could differ regarding the limiting degree of plaintiff's mental impairments in the absence of substance abuse, the Court is bound to apply the deferential substantial evidence standard.  "The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*."  *Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022) (citation and quotation marks omitted; emphasis retained).  Because there is substantial evidence to support the ALJ's factual conclusion regarding the materiality of substance use at Step 3, reversal based on that conclusion is not warranted.

**2.  ALJ's Step 3 finding re: lupus**

Plaintiff's second claim of error is that the ALJ misstated evidence concerning lupus and that plaintiff's lupus meets the criteria of Listing 14.02.  The question that the Court must answer is whether the ALJ's finding that plaintiff did not meet the criteria of Listing 14.02 is supported by substantial evidence.

The record includes notes of eight visits with rheumatologist Jessica Stein, MD, between March 2019 and February 2021.  On March 21, 2019, Dr. Stein described plaintiff's diagnosis as

"Sjogren's syndrome versus SLE versus UCTD." [8]  R. 1254.  She noted: "Patient's flares consist of fatigue, hand pain and swelling, dry eyes, dry mouth, eye/periorbital swelling.  Patient has a history of multiple admissions to the hospital with pain and swelling of hands, feet and eyes. She is usually treated with steroids and Toradol."  *Id.*  Plaintiff next saw Dr. Stein three times in June and July 2019 after a flare.  R. 1260-66.  Dr. Stein filled out disability forms in July 2019 and noted: "Pt states she is unable to work due to her disease – during her flares she is totally unable to concentrate and her physical abilities are compromised.  I believe some of her limitations are due to her psychiatric illness as well."  R. 1266.  Plaintiff returned in January 2020 and reported that she was tired and her legs hurt all the time.  R. 1267.  Dr. Stein noted that plaintiff was not currently on any antirheumatic drugs, having not filled her prescription for months, and she prescribed prednisone as needed.  R. 1268.  In March 2020, plaintiff complained of a flare and was prescribed a course of prednisone.  R. 1269-71.  In July 2020, she reported that she was taking her antirheumatic (Imuran) but Dr. Stein noted that the prescription had not been filled in some time.  R. 1279-81.  She returned in February 2021 and reported that her health was good except for pain "but the medicines help."  R. 1283-84.  She still was not taking Imuran.  R. 1285.   There is no other record of outpatient treatment for autoimmune issues.  However, when plaintiff was hospitalized for psychiatric treatment in November 2021, Dr. Stein was contacted and recommended a three-day course of prednisone for possible lupus exacerbation.  R. 1827.

---

[8] "Undifferentiated connective tissue disease is a clinical entity defined as serological and clinical manifestations of systemic autoimmune disease.  However, not fulfilling any criteria of defined connective tissue disease such as systemic lupus erythematosus, mixed connective tissue disease, Sjögren syndrome, systemic sclerosis, polymyositis, dermatomyositis, or rheumatoid arthritis."  *Undifferentiated Connective Tissue Disease*, National Center for Biotechnology Information, https://www.ncbi.nlm.nih.gov/books/NBK572061/ (last visited February 21, 2025).

To meet Listing 14.02, a claimant's systemic lupus erythematosus disorder must <u>either</u> involve two or more organs/body systems, one of them to at least a moderate level of severity, *and* at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss), <u>or</u> include repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) *and* a marked level of limitation in activities of daily living, or in maintaining social functioning, or in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

The ALJ concluded that "Listing 14.02 for SLE is not met because there is no involvement of any organ/body system to the moderate level and no constitutional symptoms/signs. There are also no repeated manifestations causing marked limitations." R. 17. Plaintiff contends that her SLE involved multiple body systems, including her hands, eyes, mouth, and constitutional symptoms including weight loss and fatigue, and her contemporaneous reports to Dr. Stein seem to support this. R. 1254 ("Patient's flares consist of fatigue, hand pain and swelling, dry eyes, dry mouth, eye/periorbital swelling."), 1280 ("Not eating a lot. She has lost even more weight."). However, substantial evidence supports the ALJ's conclusion that such involvement was not "moderate," particularly given the infrequency of plaintiff's rheumatology visits, noncompliance with prescribed medication, and the lack of objective findings on physical examination to corroborate plaintiff's assertions of flares. R. 1260-1285. Indeed, Dr. Stein's physical examinations during plaintiff's visits consistently indicate that plaintiff did not indicate any synovitis (inflammation) of the joints in her upper and lower extremities and that her range of motion was within normal functional limits. R. 1261, 1264, 1266, 1268, 1271, 1281 and 1285. As for plaintiff's assertion that her gait is markedly affected, she points to notes that do not relate to lupus but, rather, to recovery from a hysterectomy

surgery, R. 2771, and recovery from acute alcohol intoxication, R. 3068, 3560. Lastly, although there is evidence of marked limitation in activities of daily living, or in maintaining social functioning, or in completing tasks in a timely manner, those are primarily attributed in the treatment records to mental health issues and alcohol addiction rather than to lupus alone. Even plaintiff's rheumatologist, while noting plaintiff's report that "she is unable to work due to her disease – during her flares she is totally unable to concentrate and her physical abilities are compromised," questioned the extent to which lupus might be causing such symptoms, stating "I believe some of her limitations are due to her psychiatric illness as well." R. 1266. And although plaintiff's brief contends that her mania is a manifestation of lupus, R. 32-33, it cites nothing in her treatment history to support that contention.

The Court has noted plaintiff's disagreement with the following statement in the ALJ's decision:

> [T]here has been little treatment for ongoing SLE. Her medical records are silent for repeated flares. However, the extant records detail normal joints and ROM. Similarly, her records do not show any significant limits on her ability to use her hands or the need to elevate her legs.

R. 19. Plaintiff also disagrees with the ALJ's rejection of her testimony that she could not use her right hand. *Id.* One aspect of these critiques is valid: the medical records do evidence lupus flares in March 2019 (R. 1255), June/July 2019 (R. 1260-66), March 2020 (R. 1269-71), November 2021 (R. 1827), June 2022 (R. 2280), and August 2022 (R. 2734), such that the ALJ's statement that her medical records are "silent for repeated flares" is an overstatement. However, substantial evidence supports the ALJ's observations that plaintiff's lupus treatment was not extensive or regular, that there is no objective evidence of frequent flares, that the record does not reflect any "significant" limits on plaintiff's ability to use her hands or a need to elevate her legs, and that plaintiff's statements concerning the intensity, persistence and limiting effects of

19

her symptoms are not entirely consistent with the medical evidence.  R. 19, 1260-1285.

Regarding her right hand, plaintiff cites a complaint of reduced dexterity during a March 2022

hospital stay for detoxification, but the medical assessment at that time was that this symptom

was likely a result of alcohol abuse.  R. 3570.  The record also shows some synovitis in her hand

during a hospital stay in June 2022, for which she was prescribed prednisone, R. 2280, and

hand/foot swelling in August 2022 that was not assigned any particular etiology, R. 2743. [9]  But

in both instances, plaintiff was in alcohol withdrawal. [10]  Consequently, plaintiff's contention

that the ALJ misstated evidence is unavailing and does not undercut the Court's conclusion that

substantial evidence supports the ALJ's Step 3 finding that plaintiff's lupus impairment did not

meet Listing 14.02.

### 3.  Non-exertional limitations in RFC

Plaintiff's third claim is that the ALJ's RFC determination concerning her non-exertional

limitations is not supported by substantial evidence.  Specifically, she contends that the RFC

determination should have included non-exertional limitations relating to reduced pace, off-task

behavior, and absenteeism.  ECF 181- at 37.

Regarding non-exertional limitations, the ALJ found that plaintiff

Can perform simple, routine, repetitive tasks.  Can sustain concentration, pace,
and persistence for 2-hour segments.  Occasional interaction with supervisors.

---

[9] In the fact section of her brief, plaintiff discusses a January 2023 opinion by rheumatologist
Bret Sohn, MD, that would tend to support her allegations concerning pain and paralysis in her
right hand.  However, because the opinion postdates the ALJ's decision on December 16, 2022,
the Court has not considered it.

[10] After the ALJ's decision on December 16, 2022, plaintiff complained of reduced grip strength
in her right hand during a hospital stay that began on December 24, 2022.  Based on a spinal
MRI showing some moderate disc herniation, this was assessed as a neurological issue possibly
caused by "multiple recent falls."  R. 3560.  As noted *supra*, the Court has not considered this
evidence in deciding whether the ALJ's findings were supported by substantial evidence but
cites it here only to note that it would not support plaintiff's claim of error even if considered.

>Occasional, noncollaborative interaction with coworkers.  Brief and superficial (no more than 10% of the workday) interaction with the public.  Requires work with little/no changes in duties/routines.  No work requiring independent judgment (no setting duties/schedules for others, no responsibility for the safety of others).

R. 18.  Plaintiff contends that the opinions of initial agency reviewer Kelly Rogers, PhD, and of plaintiff's psychiatrist Dr. Fogel assessed greater limitations.  But Rogers specifically opined that even accounting for plaintiff's mood lability, irritability, and low frustration tolerance, she "remains able to perform tasks of 2-3 steps for periods of two hours or more over the course of a normal work week, meeting minimum production requirements," R. 182, which is consistent with the ALJ's articulation of her non-exertional limitations.  As for Dr. Fogel's January 2021 opinion, R. 929-31, it is questionable whether it reflects plaintiff's capability in the absence of substance use, as discussed above.  Moreover, the ALJ correctly noted that, even assuming that Dr. Fogel intended to assess her status in the absence of substance use addiction, his opinion is inconsistent with his observations of plaintiff during treatment visits and inconsistent with the record of repeated decompensation occurring in the context of substance use, as observed by Dr. Fogel in February 2021 just a month after he filled out the disability opinion form.  R. 1434 ("Pt was in [psychiatric unit] earlier this month, says b/c of 'bipolar.'  Pt had high [alcohol] level as well as +cannabis, this combination leads to paranoia and mood instability which generally leads to ED visits.").  Moreover, Dr. Fogel did not cite any supporting evidence in the opinion itself.  Consequently, the ALJ's assignment of only partial weight to Dr. Fogel's opinion satisfied the analysis required by 20 C.F.R. § 404.1520c, which cites the supportability of a medical opinion and its consistency with the overall record as the most important factors, and also was supported by substantial evidence.  For these reasons, the claim of error relating to non-exertional limitations is unavailing.

### 4.  Exertional limitations in the RFC

Plaintiff's final claim is that the RFC determination should have included exertional limitations relating to her right hand.  On this point, the RFC determination merely states that plaintiff can "[f]requently handle/finger."  R. 18.  The record evidence pertaining to plaintiff's hand function is discussed above in connection with the ALJ's analysis of the lupus.  As the Court concluded above, there is substantial evidence to support the ALJ's conclusion that plaintiff has no significant limits on her ability to use her hands.  The claim of error is therefore unavailing.

### D.  CONCLUSION

For the foregoing reasons, plaintiff's Motion to Remand, ECF 18, is DENIED and the Commissioner's Motion to Affirm, ECF 19, is GRANTED.

This is not a recommended ruling.  The consent of the parties allows a magistrate judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure.  Appeals from this judgment can be made directly to the appropriate United States court of appeals.  *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

SO ORDERED, this 13th day of March, 2025, at Bridgeport, Connecticut.


*/s/ S. Dave Vatti*
S. DAVE VATTI
United States Magistrate Judge